**William E. DRISKELL, Plaintiff,**

v.

**Jo Anne B. BARNHART[1], Acting Commissioner of Social Security, Defendant.**

**No. 3–01–CV–90059.**

United States District Court,
S.D. Iowa,
Davenport Division.

Jan. 28, 2002.

---

1. Jo Anne B. Barnhart became the Commissioner of Social Security on November 9, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure [Rule 43(c)(2) of the Federal Rules of Appellate Procedure], Jo Anne B. Barnhart should be substituted, therefore, for Acting Commissioner Larry G. Massanari as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Eric Schnaufer, Evanston, IL, for Plaintiff.

Gary L. Hayward, Asst. U.S. Atty., Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, William E. Driskell, filed a Complaint in this Court on May 15, 2001, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is affirmed.

## BACKGROUND

Plaintiff filed applications for Social Security Disability Benefits on May 18, 1998, claiming to be disabled since April 28, 1998. Tr. at 92–94 & 417–28. After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Jan E. Dutton (ALJ) on July 12, 2000. Tr. at 41–70. The ALJ issued a Notice Of Decision—Unfavorable on August 9, 2000. Tr. at 11–29. After the decision was affirmed by the Appeals Council on March 16, 2001 (Tr. at 5–7), Plaintiff filed a Complaint in this Court on May 15, 2001.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater*, 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan*, 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel*, 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

At the time of the hearing, Plaintiff was fifty-four years old. Tr. at 46. The ALJ found that Plaintiff's sever impairments are noninsulin dependent diabetes mellitus [2] with retinopathy, Charcot left foot [3]

---

**2.** Diabetes mellitus (DM) is a chronic metabolic disorder in which utilization of carbohydrate is impaired and that of lipid and protein enhanced; it is caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, glycosuria, water and electrolyte loss, ketoacidosis, and coma; long-term complications include neuropathy, retinopathy, nephropathy, generalized degenerative changes in large and small blood vessels, and increased susceptibility to infection. Diabetes mellitus affects at least 16 million Americans, ranks seventh as a cause of death in the United States, and costs the national economy over $100 billion yearly. About 95% of persons with DM have type 2, in which the pancreatic beta cells retain some insulin-producing potential, and the rest have type 1, in which exogenous insulin is required for long-term survival. Long recognized as an independent risk factor for cardiovascular disease, DM is often associated with other risk factors, including disorders of lipid metabolism, obesity, hypertension, and impairment of renal function. Current recommendations for the management of DM emphasize education and individualization of therapy. Controlled studies have shown that rigorous maintenance of plasma glucose levels as near to normal as possible at all times substantially reduces the incidence and severity of long-term complications, particularly microvascular complications (retinopathy, neuropathy, and nephropathy). Such control involves limitation of dietary carbohydrate and saturated fat; monitoring of blood glucose, including self-testing by the patient and periodic determination of glycosylated hemoglobin; and administration of insulin (particularly in type 1 DM), drugs that stimulate endogenous insulin production (in type 2 DM), or both.

with foot ulcers, and status post patella fracture. Tr. at 28. After hearing Plaintiff's testimony and hearing the testimony of a vocational expert, the ALJ found that Plaintiff is able to do his past relevant work as a telemarketer and photo lab technician. Tr. at 29.

Plaintiff argues that the finding that Plaintiff has past relevant work to which he can return is erroneous and, therefore, the ALJ's decision is not supported by substantial evidence on the record as a whole.

Plaintiff worked as a telemarketer from March 16, 1998 until July 15, 1998. Tr. at 118. The employer stated that Plaintiff's employment was terminated because he did not meet expectations for production. *Id.* Plaintiff also worked as a telemarketer between December of 1982 and July of 1983. Tr. at 108. The other job listed as past relevant work to which the ALJ found Plaintiff can return is that of a photo lab technician. Tr. at 29. Plaintiff worked for Ritz Camera between February 1, 1997 and April 30, 1997. He worked at the Camera Corner between August 1, 1990 and January 31, 1997. Tr. at 108. Plaintiff testified that at the Camera Corner,

"my basic job was developing and printing pictures, and then I did some sales work too, selling cameras and film and so forth." Tr. at 48. Later in the hearing, Plaintiff said: "My primary job was printing and developing, but then I did some sales work besides that too." Tr. at 62.

■■■ Plaintiff argues, first of all, that the job of telemarketer should be seen as an unsuccessful work attempt rather than as past relevant work. In order to be considered past relevant work, a job must have been done within the previous 15 years, done long enough to learn to do it, and have been substantial gainful activity. *Vincent v. Apfel,* 264 F.3d 767, 769 (8th Cir.2001). Plaintiff's work as a telemarketer was clearly done within the previous 15 years. According to the Dictionary of Occupational Titles (DOT), the job of telemarketer (299–357–014 (Tr. At 137)) requires more than one month, up to three months to learn to do the job. Plaintiff worked between March 16, 1998 and July 14, 1998. This job, therefore was done long enough for Plaintiff to learn to do it. It should also be remembered that Plaintiff had done the same kind of work in 1982 and 1983. Plaintiff reported that he

---

Some studies suggest that the risk of cardiovascular disease may be increased in some patients by intensive treatment of DM because of elevation of body weight, blood pressure, triglycerides, and total and low-density cholesterol. Pharmaceutical agents developed during the 1990s have improved control of DM by enhancing responsiveness of cells to insulin, counteracting insulin resistance, and reducing postprandial carbohydrate absorption. Stedman's Medical Dictionary, 27th Edition.

**3.** Charcot foot is a disease process first described in 1869 by the French neurologist Jean Martin Charcot. The process is characterized by pathologic fractures with an exuberant repair mechanism and is associated with mixed peripheral neuropathies. The Charcot foot in the diabetic patient (today, diabetes mellitus is the leading etiology for

the development of a Charcot joint) is a progressive condition that is not confined to bones but affects all of the tissues in the lower extremity. The neurotraumatic theory of the Charcot foot is that excessive pressure (trauma) on a foot that does not have sensation can lead to fracture, microscopic or gross, and initiate an exuberant repair process. After the trauma, sensory neuropathy ensures that the aberrant mechanical forces may go unnoticed by the patient until an enormous amount of damage is done. The Charcot Foot: Of Diabetic Charcot Arthropathy, Bret Ribotsky, D.P.M. Podiatry Magazine, *http://www.footdoc.com/footman/ribotsky.html.* Plaintiff's counsel submitted an article on Charcot Marie Tooth Disease to the ALJ. Tr. at 180–88. Charcot–Marie–Tooth Disease, however, is a different disease than Charcot foot.

worked six hours a day four days a week and five hours a day one day each week. He earned $6.25 per hour. This indicates that the work was substantial gainful activity. ($6.25 × 6 × 4 = $150.00. $6.25 × 5 = $31.25. $150.00 + 31.25 = $181.25 × 4.3 weeks in a month = $779.38). *See* 20 C.F.R. § 404.1574, Table 1, which states that between January 1990 and June 1999, earning over $500.00 per month shows that work activity was substantial gainful activity. This job, therefore, was done within the last 15 years, was done long enough to learn to do the job, and was substantial gainful activity.

Plaintiff argues that the job of telemarketer should be seen as an unsuccessful work attempt rather than as substantial gainful activity and, therefore, not part of his past relevant work. In *Smith v. Apfel,* 157 F.3d 571, 572 (8th Cir.1998), the Court wrote:

> 20 C.F.R. § 404.1574(a)(1) provides that in determining whether an individual is able to engage in substantial gainful activity, the agency will generally consider work that a claimant is "forced to stop after a short time because of [an] impairment as an unsuccessful work attempt and ... earnings from that work will not show that [claimant is] able to do substantial gainful activity." In *Andler v. Chater,* 100 F.3d 1389, 1392 (8th Cir.1996), we held that a "work effort that lasts less than three months can be considered an unsuccessful work attempt when a claimant is unable to perform work for more than a short time, and must quit due to an impairment." *See also King v. Chater,* 72 F.3d 85, 86 (8th Cir.1995); *Sample v. Shalala,* 999 F.2d 1138, 1142 (7th Cir.1993).
>
> Here, it seems very clear that Smith was not able to continue his work because of his back condition. This is demonstrated not only by his own testimony, but by the medical evidence in the record and the fact that he required a second and third surgery after his unsuccessful work attempt. Therefore, we conclude that Smith is entitled to disability benefits for the stated period.

20 C.F.R. § 404.1574(a)(1)(4) provides:

> (4) If you worked between 3 and 6 months. We will consider work that lasted longer than 3 months to be an unsuccessful work attempt if it ended, or was reduced below substantial gainful activity earnings level, within 6 months because of your impairment or because of the removal of special conditions which took into account your impairment and permitted your to work and—
>
> (i) You were frequently absent from work because of your impairment;
>
> (ii) Your work was unsatisfactory because of your impairment;
>
> (iii) You worked during a period of temporary remission of your impairment; or
>
> (iv) You worked under special conditions that were essential to your performance and these conditions were removed.

■ In both the cases and regulations cited above, it is clear that for work to be considered an unsuccessful work attempt, the claimant's impairment must be the deciding factor which interferes with the ability to continue working. In the *Smith* case, this was demonstrated by testimony *and* medical evidence in the record that a second and third surgery was required. The cited regulations use the phrase "because of your impairment" throughout. Likewise, the Social Security Ruling (SSR 86–25) cited in Plaintiff's brief emphasizes that to qualify as an unsuccessful work attempt, the reason for the termination of work must be the impairment or the withdrawal of special conditions which made employment possible. In the case at bar, although the employer wrote that Plaintiff's work was unsatisfactory, there is no medical evidence to corroborate Plaintiff's

testimony that his work as a telemarketer was unsatisfactory *because of* his impairment. The employer reported that Plaintiff was separated because he did not meet production expectations. Tr. at 118. The employer made no mention that Plaintiff's inability to meet production goals was due to a medical impairment. A review of the medical evidence in this case did not reveal any complaints by Plaintiff to his medical providers that he was having difficulty performing any of his work activities. The Court, therefore, finds no error in the ALJ's finding that the job of telemarketer is part of Plaintiff's past relevant work.

It should be kept in mind that it is Plaintiff's burden to produce evidence which supports his contention that he suffers from a severe impairment which prevents him from performing his past relevant work. *McCoy v. Schweiker,* 683 F.2d 1138,1146–47 (8th Cir.1982)(en banc). In spite of the fact that Plaintiff's claim was denied at the reconsideration stage of the administrative process because he was found able to return to his past relevant work (Tr. at 86), no effort was made by Plaintiff to produce evidence that his inability to perform the job of telemarketer was do to his diabetes or from the complications of that illness. The Court of Appeals for the Eight Circuit has explained many times that there is a difference between an impairment and disability. Or, put another way, "there is no doubt that the claimant is experiencing pain, the real issue is how severe that pain is." *Gowell v. Apfel,* 242 F.3d 793, 796 (8th Cir.2001), and cases cited therein. In the opinion of the Court, the ALJ's finding that Plaintiff has the ability to return his past relevant work as a telemarketer is supported by substantial evidence on the record as a whole. The Court has considered Plaintiff's argument that the ALJ mis-represented Plaintiff's alleged onset of disability date, but finds, nevertheless, that the ALJ's finding that Plaintiff can return to his past relevant work as a telemarketer is supported by substantial evidence on the record as a whole.

Plaintiff argues that the finding that Plaintiff could return to his past work as a photo lab technician is erroneous because this job was part of a composite job which included the position of sales clerk from which Plaintiff is precluded. Although the Court need not decide this issue because Plaintiff has the ability to return to his past work as a telemarketer, the Court did consider the arguments raised in Plaintiff's brief and read the authority which was cited. The Court would note that Plaintiff made it very clear during his testimony that the photo lab technician portion of his work in the camera shops was the most significant aspect of his work, and that only occasionally would he be called upon to act as a sales clerk. This issue would have been much more interesting, although still moot in light of the finding regarding the telemarketer job, had the finding been that Plaintiff could return to sales clerk positions rather than photo lab technician positions. Furthermore, at the administrative hearing, counsel for Plaintiff conceded that the vocational expert's characterization of Plaintiff's past relevant work was correct. Tr. at 45.

A more important question is whether or not Plaintiff has the residual functional capacity to perform his past work. The ALJ's finding that Plaintiff can do his past work is based on the testimony of the vocational expert in response to the following hypothetical question:

First of all, if the claimant has no mental restrictions but essentially needs to have a desk job, that's what we're talking about here today. His lifting should be no more than 20 pounds on an occasional basis, ten pounds of a frequent basis. He can stand or walk for two hours in an eight hour day. He can sit with

normal breaks for six hours in an eight hour day. No limitation in use of his arms, but he should not be required to do postural activities on more than an occasional basis, climbing, balancing, stooping, kneeling, crouching or crawling. No restrictions in manipulation. His vision is 20/40 and 20/50 corrected. He was able to do the telemarketing and work at a computer, do that type of work. So, I'm not finding a restriction in ability to read or acuity or perception. No restriction in communication, but from an environmental standpoint should avoid exposure to concentrated heat, cold, wetness, humidity, vibration, and he should not be working with hazards such as dangerous machinery or heights. With that functional capacity could he return to any of his past work? Tr. at 63–64. In response, the vocational expert testified that Plaintiff has the ability to do the two jobs discussed above. Tr. at 64.

■ A review of the medical evidence in this case indicates that Plaintiff's primary impairment is type 2 diabetes. As a result of the diabetes, Plaintiff's suffers several complications such as retinopathy, Charcot foot syndrome, and foot ulcers. The early medical records indicate that Plaintiff was counseled, time and time again, to keep his blood sugar under control, and that Plaintiff consistently failed to heed the advise. For example, on July 17, 1997, the entry states that Plaintiff had not been checking his blood sugars nor following his diet. Plaintiff continued to have hyperlipoidemia and was in need of foot care. Tr. at 241. Laboratory reports (Tr. at 279–316) consistently show that Plaintiff's blood sugar readings were extremely high. For example on June 14, 1995, the glucose level was 314 with a normal range being between 65 and 115. Tr. at 303. When Plaintiff followed the recommendations that were given his blood sugar responded. On September 25, 1995, a note to Plaintiff from Community Health Care, Inc., states that blood sugar was 168, "excellent."[4] The author wrote: "GOOD WORK KNEW YOU COULD DO IT!" Tr. at 328 (emphasis in original). The point is that Plaintiff's lack of control of his illness was due to his failure to follow the recommendations of his health care providers. Although the claim was not denied on this basis, it is worth noting that failure to follow a prescribed course of remedial treatment without good cause is grounds for denying benefits. *Johnson v. Apfel,* 240 F.3d 1145, 1148 (8th Cir.2001).

More recent medical records are from the University of Iowa hospitals and Clinics. Tr. at 357–78, 389–416, 430–39. At the University, Plaintiff was treated for left Charcot foot, right knee surgery to repair a fracture, and diabetic retinopathy. Some of the notations at the University would indicate that Plaintiff's blood sugar was under better control. See e.g. Tr. at 367 ("Blood sugars are well controlled." June 1, 1998), Tr. at 404 ("He has had no sugar malcontrol ..." March 21, 2000).

In spite of the aforementioned noncompliance, and in spite of the complications which developed as a result of Plaintiff's diabetes for which he was treated at the University of Iowa, any mention of functional restrictions by Plaintiff's doctors is conspicuously absent from this record. Plaintiff was never told to limit his activity in any way, nor did Plaintiff complain to any doctor that any type of physical or mental activity caused an exacerbation of his symptoms. On the contrary, he reported that he was doing well and had no complaints. For example, when Plaintiff was seen on January 25, 1999, for Charcot

---

4. Although 168, according to the aforementioned lab reports, is still high, it is much closer to the normal range than readings that were over 300.

foot, he reported that he was not having any problems with his foot. Tr. at 362.

■ On the other hand, on March 8, 2000, a doctor who signature is not legible, checked a box on a form which indicated that Plaintiff is unable to return to his usual duties. The problems with this document are obvious. It was not signed by an identifiable doctor; it is inconsistent with all the other medical notations in the record; and, at best, it represents a conclusory statement unsupported by other evidence. It is well settled that such evidence is entitled to very little, if any, weight. *Johnson v. Apfel,* 240 F.3d at 1148 (the Commissioner may reject the opinion of any medical expert which is inconsistent with the evidence as a whole.)

Because the Court finds that the ALJ's decision to stop the sequential evaluation at step 4 is supported by substantial evidence on the record as a whole, it is not necessary to consider or discuss Plaintiff's arguments regarding the ALJ's questions to the vocational expert about transferable skills. *See* Tr. at 64–65.

## CONCLUSION AND DECISION

The Commissioner's decision is supported by substantial evidence on the record as a whole and not affected by errors of law which require reversal. *See Bradley v. Bowen,* 660 F.Supp. 276, 278 (W.D.Ark.1987). The Court has considered the evidence which detracts from the Commissioner's decision as well as evidence which supports it.

In the opinion of the Court, the ALJ's finding that Plaintiff is able to perform the duties of his past relevant work and therefore not disabled, is supported by substantial evidence on the record as a whole.

The Commissioner's decision, therefore, is affirmed and the case is hereby dismissed.

IT IS SO ORDERED.