**Corey S. HURSTROM, Jr., Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 3:01–CV–90176.**

United States District Court, S.D. Iowa, Davenport Division.

Nov. 18, 2002.

Brett A. Nelson, Esq., Rock Island, IL, for Plaintiff.

Gary L. Hayward, Esq., Assistant United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Corey S. Hurstrom, filed a Complaint in this Court on December 14, 2001, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II (for child's insurance benefits as the disabled adult child of his deceased father), and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed and remanded for an award of benefits.

## BACKGROUND

Plaintiff filed applications for Social Security Disability Benefits on August 30, 1999, claiming to be disabled since June 12, 1985 [1]. Tr. at 100–02 & 279–80. After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Andrew T. Pasestini (ALJ) on April 10, 2001. Tr. at 37–66. The ALJ issued a Notice Of Decision—Unfavorable on June 15, 2001 Tr. at 19–28 (Childhood Disability Benefits) & Tr. 9–18 (SSI benefits). After the decisions were affirmed by the Appeals Council on October 16, 2001 (Tr. at 6–7), Plaintiff filed a Complaint in this Court on December 14, 2001.

## MEDICAL RECORDS

When Plaintiff was 13 years old, he was treated at the University of Iowa Pediatric Endocrine Clinic because of his short stature. In addition, Plaintiff had been diagnosed with type I diabetes. When Plaintiff was seen at the University on March 25, 1993, his Hemoglobin A1C [2] (Hgb–A1C) was 10.9. Although Plaintiff was 13 years, two months old, his bone age was determined to be only 10 years. Tr. at 149–50.

Plaintiff was hospitalized on July 8, 1994, with an admitting diagnosis of diabetic ketoacidosis [3]. Plaintiff's mother reported that several hours prior to admission, he started having episodes of respiratory distress and hallucinations. Plaintiff blood sugar was too high to be recorded on his glucometer. Tr. at 157. An office note from Barry S. Barudin, M.D. dated July 13, 1994, states that Plaintiff recovered and had been discharged from the hospital the day after admission. Tr. at 171.

On October 20, 1994, Patricia Donohoue, M.D., from the University of Iowa, wrote to Dr. Barudin regarding recommendations for additional treatment for Plaintiff's short stature. In May of 1994, Plaintiff had undergone a course of testosterone treatments which had improved his height velocity, but it was accomplished at an

---

1. The ALJ noted that based on an application of April 29, 1985, Plaintiff was found disabled as a child and eligible for SSI benefits. Upon attaining age 18, however, his claim was re-evaluated and it was determined that he was no longer disabled. That decision was issued on July 1998, and Plaintiff did not request reconsideration. Tr. at 13. The ALJ found that good cause to reopen that decision had not been established and this Court does not have jurisdiction to review that finding. *Califano v. Sanders,* 430 U.S. 99, 107–08, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977).

2. A test that measures a person's average blood glucose level over the past 2 to 3 months, the test shows the amount of glucose that sticks to the red blood cell, which is proportional to the amount of glucose in the blood. *See* American Diabetes Association's web site at *http://www.diabetes.org/main/info/dictionary.jsp* According to Thomas A. Lincoln, MD, (*ht tp://www.diabetes.org/main/community/forecast/page66.jsp),* a healthy person without diabetes will have an A1C value that ranges between 4 percent and 6 percent. If diabetes is under good control, the A1C value should be below 8 percent. If the patient is doing especially well, the A1C value will be less than 7 percent and may even approach the normal level. The closer it is to this normal level, the better the diabetes is under control. A good blood sugar range for most people with diabetes is from about 70 to 120 (mg/dl). According to Dr. Lincoln, an A1C value of 10 indicates average blood sugars of 240, and an A1C of 11 indicates blood sugars of 270.

3. ACIDOSIS: A pathologic state characterized by an increase in the concentration of hydrogen ions in the arterial blood above the normal level... KETOACIDOSIS results from lack of food intake, leading to fat catabolism to provide energy, releasing acidic ketone bodies. Stedman's Medical Dictionary, 27th Edition

unacceptably rapid degree over a short period of time. For that reason, Dr. Donohoue did not recommend a second course of treatment. Tr. at 214. An undated letter from Stacy Tschannen, M.D., states she had taken over Dr. Barudin's practice upon his departure. She said that Plaintiff had last been seen by Dr. Barudin on April 18, 1997, and had not yet been seen by her. Tr. at 216.

A laboratory report dated March 27, 1997, showed Plaintiff glucose to be 219, and his Hgb–A1C to be 11.6.

Plaintiff saw Paul R. Hartmann, M.D. on March 4, 1998. Plaintiff told the doctor that his diabetes was easy to control and that he had no limitations on his ability to function. Plaintiff told Dr. Hartmann that his last Hgb–A1C was in an acceptable range. Plaintiff told the doctor that he was a high school graduate and that he had earned "mostly A's and B's in school and a couple of C's." He also said that he was looking for work but also had an interest in going to art school. Plaintiff was described as well developed and in no acute distress with a height of 64 inches and weight of 128 pounds. Tr. at 223. After the examination, Dr. Hartmann wrote that Plaintiff had uncomplicated Type I diabetes. "I asked him to describe his remaining physical capacities today and he stated they remain unrestricted." Tr. at 224. There is no indication that Dr. Hartmann was provided any medical records for review. After the examination, Plaintiff's mother wrote a letter to the State Agency which had arranged the examination. In this letter she stated that Dr. Hartmann appeared to be very sarcastic with Plaintiff and when Plaintiff was unable to articulate the reason for his disability, the examination was terminated. Tr. at 111–12. On May 7, 1998, the Unit Supervisor of the state agency wrote a letter of apology for the way Plaintiff and

his mother were treated at the examination. Tr. at 110.

On October 7, 1999, Plaintiff saw R. Chakalackel, M.D. for a consultative examination. Plaintiff reported that on good days his blood sugar levels run from the 150's to the 190's, and that they sometimes fluctuate from the 60's to the 300's. The only complaint voiced by Plaintiff was cramping around his knees for which he had not sought medical care and which was controlled with aspirin and Tylenol. Plaintiff reported that he had recently obtained his GED. Tr. at 230. After an examination (Tr. at 230–31), Dr. Chakalackel wrote that Plaintiff had no limitations other than difficulty kneeling for long periods of time. Tr. at 231.

Plaintiff was seen by Catherine Weideman, M.D. on October 18, 1999. Plaintiff complained that he has cramping in his calves after walking. Plaintiff said that he walks every day, but that he does not always have the cramping. Plaintiff said that two or three times a week, he has hypoglycemia in the afternoon, at which time he feels disoriented, dizzy, sweaty, shaky. He said that he caries candy to counteract the symptoms. Tr. at 235. The doctor did not note any depression, anxiety or insomnia. Dr. Weideman's impression was that Plaintiff's diabetes was probably under poor control. Tr. at 236. A laboratory report showed Plaintiff's blood sugar to be 235 mg/dl. Tr. at 237. A lab report dated October 20, 1999, showed Plaintiff's glucose to be 348. The report states that a "normal" range is between 70 and 105 for a fasting test, and between 70 and 140 for a random test. Plaintiff's Hgb–A1C was 10.8 (the report states that greater than 9 indicates poor control. *See also* footnote 1, above). Tr. at 239.

A diabetic report completed for Disability Determination Services by a doctor

whose signature is not legible states that Plaintiff's only limitation is that he is easily fatigued. The report is dated February 23, 2000. Tr. at 242.

Plaintiff was admitted to the hospital on December 19, 2000, with an acute depressive anxiety disorder. Tr. at 248–60. When Plaintiff was seen by Dr. Weideman, he was quite drowsy. Tr. at 250. In spite of the drowsiness, Plaintiff was easily awakened, and was cooperative with the examination. The doctor recommended extensive diabetes education. Tr. at 251. Under the heading History of Present Illness, Thomas A. Garside, M.D. wrote:

... He was admitted to the hospital with a history of two months of increasing depressive mood, social withdrawal, paranoid fearfulness, and ideas of harm coming to himself, or to his mother if he does not have continuing contact with her. There have been multiple ideas of reference and delusions of reference with calls home from shopping centers where he felt there was a conspiracy to kill him by the way people were looking at him, and things of this sort. He has lost 20 to 25 pounds. He is highly anxious, has a severe sleep disorder with mind racing, almost constant delusional fears with conspiratorial themes and he has been battling with suicidal impulsion, but has not made a plan. He ruminates ideas of humiliating childhood abuse, trauma, forced ideas and memory. He has not had previous treatment. Apparently, this has all developed in the past two months or so. The precipitating stressor appears to be the breakup of a 10–month relationship with a girlfriend who apparently terminated rather abruptly with him. When he, in a sense, forced himself, by going over to her place of residence, finding her with another male. Later that night, he went to a bar in Moline. Subsequent to that night, has begun to believe that everybody in the bar and the public knows about the girlfriend, ridiculing him, he is followed, monitored, and things of this sort. He has been markedly depressed. Tr. at 252. The doctor went on to relate that Plaintiff's deceased father had been verbally abusive and violent to him, and that Plaintiff was thinking of changing both his first and last names. The doctor noted that Plaintiff seemed to be excessively dependent on his mother and that she often spoke for him during interview situations. Tr. at 252. Dr. Garside's impression was that Plaintiff had an acute psychotic reaction with depressive and paranoid features. Tr. at 253. During the hospitalization, Plaintiff's blood sugar levels ranged from 44 to greater than 400. Tr. at 255. A Hemoglobin A1C on February 16, 2001 was 8.9, which Dr. Weideman said had improved from December when it was 9.7. Dr. Weideman noted that Plaintiff's blood sugars ranged from 289–347 in the morning, 108–239 at lunch, and 255–359 at bed time. Tr. at 264.

The day before the hospitalization, Plaintiff was seen at Vera French Community Mental Health Center by Jeffrey A. Kranz, LISW, clinical social worker, for an intake interview. Tr. at 275–77. Plaintiff's mother attended the interview and provided most of the history. She related that since Plaintiff and his girlfriend had broken up, Plaintiff had been very depressed and had become paranoid. "If his parents aren't home, he is afraid someone will come in and get him." The night before, the entire family had to sleep in the living room because of Plaintiff's fear. Plaintiff's mother stated that when he was in school, he had been teased because of his size and looks. "His school years were extremely brutal. Students would shut him in lockers and he was scared all the time." That was the reason why he was taken out of school and obtained his GED after studying at home. His mother also said that after his father died, Plaintiff told

her that his father had sexually abused him when he was 15 years old. Tr. at 275. On mental status examination, it was noted that Plaintiff was casually dressed and slightly disheveled. Plaintiff was tearful throughout most of the session and he was described as being "extremely depressed." On Axis I, Plaintiff's was diagnosed with adjustment disorder with depressed mood, rule out major depressive disorder, and rule out post-traumatic stress disorder. On Axis II the diagnosis was dependent personality disorder. Tr. at 276. Dr. Garside saw Plaintiff on December 19, 2000, diagnosed an acute psychotic reaction and admitted Plaintiff to the hospital. Tr. at 274. Dr. Garside saw Plaintiff on at least seven occasions after he was released from the hospital for medication prescription renewals. Tr. at 271–73. The final office note is dated April 9, 2001, one day before the administrative hearing. Tr. at 271.

### ADMINISTRATIVE HEARING

Plaintiff and his mother appeared and testified at a hearing on April 10, 2001. Tr. at 37–66. Plaintiff testified that his primary disability is his diabetes. Tr. at 41. He said that he takes insulin shots 4 or 5 times a day. Plaintiff attributed the hospitalization the previous December to his diabetes. Tr. at 42. Plaintiff said that he had been told that he had some kidney damage due to his diabetes (See Tr. at 262 which is a page of office notes from Dr. Weideman which states "Diabetes W/ renal manifest"). Plaintiff testified that his blood sugar readings fluctuate between 700 and 40. Tr. at 45. The morning of he hearing, he said it was 480 so he took extra insulin. When the blood sugar is low, he feels sweaty, cold, shaky and dizzy. Also, his eyes get blurry. Tr. at 46. Plaintiff said that he sleeps 15 or 16 hours per day. He said that he has headaches 3 or 4 times a week. Tr. at 48. When he gets a bad headache, he takes extra insulin. Plaintiff said that he calls his doctor's office fre-

quently to report his blood sugar test results and that his insulin dosage is adjusted accordingly. Tr. at 33–34.

When Plaintiff's mother testified, she was asked about the kidney damage Plaintiff had mentioned. She said that she had been told that the high blood sugar had caused Plaintiff to have protein in his urine and, as a result, he was put on medication to help preserve his kidneys. Tr. at 56. Plaintiff's mother said that when Plaintiff gets low blood sugar, he gets cold and sweaty at the same time, needs to take something with sugar, and thereafter is very tired. Tr. at 58. In response to a question from the ALJ, she testified that Plaintiff's blood sugar fluctuates throughout the day, sometimes as high as 400 or 500. Tr. at 51.

The ALJ called Roger Marquardt to testify as a vocational expert. Tr. at 62. The ALJ asked the vocational expert the following question:

I'd like the vocational expert to consider what affect it would have on the claimant's ability to perform work activity if he could not engage in any strenuous work activity, any walking would be of a short distance. He should avoid heights, moving machinery, climbing, any kind of sharp instruments. That work activity should be simple, routine and repetitive with no stressful interaction of others. No fast cognitive based for the work duties. With those limitations and abilities, and considering that he is a younger individual with the equivalent of a high school education, would there be unskilled work that he could perform?

Tr. at 62–63. In response, the vocational expert pointed to examples of unskilled sedentary work. Tr. at 63. When he was asked about the affect of fluctuating blood sugars which would require Plaintiff to stop working, to either take insulin or to increase carbohydrates to stabilize the

blood sugar, during which periods he would have to be away from work, the vocational expert testified that competitive work would be precluded. Tr. at 63–64.

## ADMINISTRATIVE DECISION

In the decisions dated June 15, 2001, following the sequential evaluation set out in the regulations, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time pertinent to the decision. The ALJ found that Plaintiff does not have a severe impairment and, therefore, that he is not disabled. Tr. at 17–18 & 27–28.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134,

1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

Just as in the case of *Simmons v. Massanari,* 264 F.3d 751, 755 (8th Cir.2001), the essential question in this case is whether the ALJ erred in terminating the sequential evaluation at step two. The Court went on to write: "The sequential evaluation process may be ended at step two when an impairment or combination of impairments would have no more than a minimal effect on the claimant's ability to work. *Nguyen v. Chater,* 75 F.3d 429, 431 (8th Cir.1996)." In *Caviness v. Massanari,* 250 F.3d 603, 605 (8th Cir.2001), the Court held that although the claimant bears the burden at step two, "the burden of a claimant at this stage of the analysis is not great. The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [the] ability to work."

In the case at bar, Plaintiff suffers from a very severe case of type I diabetes. *See Driskell v. Barnhart,* 182 F.Supp.2d 803, 806 n. 2 (S.D.Iowa 2002) (definition of diabetes). Unlike the claimant in *Driskell,* there is no evidence in the case at bar that Plaintiff failed to heed the advice of his doctors regarding the proper care of his illness. Rather, in spite of his best efforts, Plaintiff's diabetes proved difficult, if not impossible, to control. Among the limitations that the diabetes places on Plaintiff's ability to function is fatigue. When Plaintiff is having low blood sugar, he feels sweaty, cold, shaky and dizzy. In addition, his vision becomes blurry. Plaintiff also testified that he frequently calls his doctor's office to report his blood sugar and to receive instruction on how to adjust his insulin. These are all factors which interfere with the ability to perform competitive work activity. In *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982)(en

banc), the Court held that the residual functional capacity contemplated by the Act and regulations "is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *See also Hall v. Chater,* 62 F.3d 220, 223 (8th Cir. 1995)("For a claimant to qualify for work at any level, that claimant must have the ability to perform the tasks of employment on a daily basis."). Plaintiff's out-of-control blood sugar is well established by numerous laboratory tests as well as by the testimony of Plaintiff and his mother. Furthermore, Plaintiff suffered an acute psychotic reaction for which he was hospitalized. Plaintiff has been diagnosed with a dependent personality disorder as well as possible major depression and post-traumatic stress disorder.

 The only evidence which supports a finding that Plaintiff does not have a severe impairment are the reports of the consultative examinations. In the first place, the reports of doctors who have examined a claimant once are not substantial evidence upon which to base a denial of disability, especially when contradicted by other medical evidence in the record. *Lauer v. Apfel,* 245 F.3d 700, 705 (8th Cir.2001). There is no indication that either Dr. Hartmann or Dr. Chakalackel had access to any of the medical records which were available at the time of their examinations. Instead, they seem to have relied on Plaintiff's statement that his diabetes did not cause him any problems. Even if Plaintiff told the consulting doctors that he had no limitations, these statements are not credible in light of the numerous laboratory reports showing that his blood sugar is out of control. Furthermore, a claimant's true functional ability may be substantially less than the claimant asserts or wishes. *Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir.2001) citing *Parsons v. Heckler,* 739 F.2d 1334,

1341 (8th Cir.1984). The finding that Plaintiff does not have a severe impairment, therefore, is not supported by substantial evidence in the record as a whole.

The only remaining question is whether the case should be remanded to complete the sequential evaluation, or if the record before the Court is sufficiently developed to order an award of benefits. At the hearing, the ALJ asked two questions of the vocational expert. The first question assumed that Plaintiff would be able to do work activities which the vocational expert said would permit unskilled sedentary work. When, however, the effects of the uncontrolled diabetes were taken into account, the vocational expert testified that no work would be possible. If a person with a severe case of type I diabetes is going to work, that person likely will need significant work accommodations.

> Work accommodations may include a flex schedule to allow for sick days and frequent breaks for small meals or insulin injections. A private place to monitor glucose levels and administer insulin may be needed. Restrictions may be placed on continuous physical exertion, working in extreme temperature or moist areas, working at unprotected heights, and working in isolated areas alone. As the disease progresses, work requiring visual acuity or fine dexterity may need to be limited

Presley Reed, M.D., The Medical Disability Advisor, Workplace Guidelines for Disability Duration, page 482. In *Eback v. Chater,* 94 F.3d 410, 412 (8th Cir.1996), the Court explained that there is a difference between how cases are decided under the Americans With Disabilities Act (ADA) and those decided under the Social Security Act. Under the Social Security Act, "[The inquiry into other available jobs] is based on the functional demands and duties of jobs as ordinarily required by employers throughout the national econo-

my, and not on what may be isolated variations in job demands (regardless of whether such variations are due to compliance with anti-discrimination statutes or other factors.)" *Id.*

In the case at bar, when the vocational expert was asked to consider the effects of Plaintiff's diabetes on his ability to function in a work situation, the vocational expert testified that all competitive work would be precluded by the need to take frequent breaks for food or insulin. The Court, therefore, finds no need to remand for further proceedings.

In *Seavey v. Barnhart,* 276 F.3d 1, 11–12 (1st Cir.2001), the Court wrote:

[I]f the evidence and law compelled one conclusion or the other, then the court could order an award of benefits or affirm a denial of benefits. For example, a judicial award of benefits would be proper where the proof of disability is overwhelming or where the proof is very strong and there is no contrary evidence. (Citation omitted) Similarly, if correcting the legal error clarified the record sufficiently that an award or denial of benefits was the clear outcome, then the court may order or affirm denial. Conversely, if an essential factual issue has not been resolved, as here, and there is no clear entitlement to benefits, the court must remand for further proceedings. A number of circuits appear to have adopted this view.

The Court of Appeals for the Eighth Circuit has also held that when the Commissioner's decision is not supported by substantial evidence on the record as a whole, and where the record contains evidence to support a finding of disability such that remand would only delay the receipt of benefits, a reversal with an award of benefits is the appropriate remedy. *See, e.g. Ingram v. Barnhart,* 303 F.3d 890 (8th Cir.2002); *Gavin v. Heckler,* 811 F.2d 1195 (8th Cir.1987).

## CONCLUSION AND DECISION

Having reviewed this record in detail, considering the evidence which supports the Commissioner's decision as well as the evidence which detracts therefrom, the Court cannot find that the decision to deny benefits is supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D. Ark. 1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b).

IT IS SO ORDERED.